## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

JOSEPH McMULLIN,

               Plaintiff,

v.

ANDREW W. PEIRSON, in his individual capacity,

               Defendant.

Civil Action No. 1:17-cv-312-NT

## DEFENDANT ANDREW PEIRSON'S MOTION FOR SUMMARY JUDGMENT
## WITH INCORPORATED MEMORANDUM OF LAW

Plaintiff Joseph McMullin's claim in this case arises from his arrest by the defendant, Maine State Police Trooper Andrew Peirson, for operating under the influence (OUI). Mr. McMullin concedes that Trooper Peirson had probable cause to arrest him; his sole claim is that Peirson used excessive force in doing so. Yet Trooper Peirson used force against Mr. McMullin only after McMullin repeatedly refused to give Trooper Peirson his wrists for handcuffing, led Peirson on a slow-motion chase around the roadway—including into the oncoming traffic lane—and then physically resisted when Trooper Peirson finally grabbed Mr. McMullin's wrist to handcuff him. Only then did Peirson strike Mr. McMullin with an open hand in an effort to distract his attention in order to place him in handcuffs. In the ensuing scuffle, Peirson and McMullin fell to the ground and Peirson applied two or three additional strikes in an effort to gain control over the resisting Mr. McMullin.

Plaintiff asserts that the use of force in these circumstances was excessive. But the federal courts, including the First Circuit, have recognized that, in making an arrest, a police officer has the right to use objectively reasonable force. See *Graham v. Connor*, 490 U.S. 386 (1989);

1

*Statchen v. Palmer*, 623 F. 3d 15 (1st Cir. 2010); *Steeves v. City of Rockland*, 600 F. Supp. 2d 143 (D. Me. 2009). Here, Trooper Peirson was alone. It was dark. Mr. McMullin was intoxicated, acting erratically, and had repeatedly refused to submit to arrest. When Trooper Peirson grabbed Mr. McMullin's wrist, McMullin physically resisted him. Under those circumstances, it was reasonable for Trooper Peirson to use an open-handed strike to overcome Mr. McMullin's resistance. While it is unfortunate that Mr. McMullin was injured by the strike or in the scuffle that followed, that injury cannot be attributed to any unreasonable conduct by Trooper Peirson.

Furthermore, even if Trooper Peirson's actions were mistaken, qualified immunity protects mistakes, so long as they are reasonable mistakes. Trooper Peirson was forced to make a split-second decision in a tense and rapidly evolving situation. Defendant is aware of no controlling decisions by the First Circuit or Supreme Court, nor any consensus of out-of-circuit caselaw, that would have put Trooper Peirson on notice at the time of the incident that it is unconstitutional to apply an open-handed strike to a suspect who refuses to obey repeated commands to submit to arrest, who continually backs away from the arresting officer, and who then physically resists the officer's attempts to handcuff him. Trooper Peirson's actions were not contrary to clearly established law, and he is entitled to immunity.

Because the undisputed facts entitle Trooper Peirson to qualified immunity for his actions, summary judgment should be entered for Trooper Peirson on the complaint.

## MEMORANDUM OF LAW

### Summary of Undisputed Facts

On the night of February 21, 2016, Trooper Peirson was on duty, patrolling in his marked police cruiser in Howland, Maine. Defendant's Statement of Material Facts ("DSMF") ¶¶ 2-3. At about 8:00 pm, Trooper Peirson stopped Mr. McMullin's vehicle based on a reasonable

2

suspicion that Mr. McMullin was intoxicated. *Id*. ¶ 7. The vehicles stopped in a 25-mile-per-hour zone on River Road, just before a bend in the road. It was dark outside; the road was illuminated by street lights and the headlights of the two vehicles. *Id*. ¶ 9.

Trooper Peirson approached the car and spoke with Mr. McMullin, who was the driver. Mr. McMullin's speech was slurred, his eyes were glazed over, and he smelled of alcohol. *Id*. ¶¶ 11-12. Two young women were in the backseat of Mr. McMullin's vehicle: Ashley McMullin, Mr. McMullin's then 15-year old daughter, and Kylie Tibbets, the then 18-year-old girlfriend of Mr. McMullin's son. *Id*. ¶ 13.

Trooper Peirson had Mr. McMullin step out of his vehicle and administered field sobriety tests on him. *Id*. ¶ 16. The results of those tests gave Trooper Peirson probable cause to arrest Mr. McMullin for criminal OUI, 29-A M.R.S. § 2411. *Id*. ¶ 17. Trooper Peirson told McMullin, "At this time I'm going to place you under arrest, OK? Go ahead and put your hands behind your back, alright?" *Id*. ¶ 18. As Trooper Peirson informed Mr. McMullin he was under arrest, Peirson positioned himself so McMullin was between him and the hood of Peirson's cruiser. *Id*. ¶ 19.

Mr. McMullin failed to comply. He stepped to his left and began backing toward his own vehicle, stating, "I'm not leaving my kids in my car dude." *Id*. ¶ 20. As he backed away he repeated, twice, that he was not leaving his kids. *Id*. ¶ 21.

Trooper Peirson followed Mr. McMullin and told him, in a calm voice, "Sir, I'm going to call your wife—I'm going to call your wife, and she's going to come get them." *Id*. ¶ 22. Mr. McMullin responded, "After you do that, you can take me in." *Id.* ¶ 23. Trooper Peirson did not agree to call Mr. McMullin's wife before handcuffing him because he believed it would create a flight risk and a safety risk to leave Mr. McMullin unsecured while he made a phone call after telling Mr. McMullin he was under arrest. *Id*. ¶ 24.

3

Mr. McMullin's movements and statements made Trooper Peirson uncertain how far Mr. McMullin would go to avoid being arrested. *Id.* ¶ 25. Trooper Peirson repeated, in a calm voice, "turn around and put your hands behind your back." *Id.* ¶ 26. Mr. McMullin then warned Trooper Peirson: "we're going to have an issue. You're not going to leave my car—my kids here." *Id.* ¶ 27. At this point, Mr. McMullin was standing on the double yellow line in the center of the road, near the rear of Mr. McMullin's vehicle. *Id.* ¶ 28. As Mr. McMullin continued to back away from Trooper Peirson, Peirson assured him that "your kids will be fine" and again commanded him, in a calm voice, to turn around and put his hands behind his back. *Id.* ¶ 29.

Mr. McMullin did not comply. Instead, he began backing up faster, along the double yellow line, with his arms extended laterally. *Id.* ¶ 30. Mr. McMullin then walked backwards into the southbound, oncoming-traffic lane as he called to his passengers about a phone. *Id.* ¶ 31. As Trooper Peirson followed him into the southbound lane, Mr. McMullin warned Peirson: "You're not touching me dude." *Id.* ¶ 32. Trooper Peirson recognized that being in the southbound lane put them both in danger of being struck by vehicles that might approach from the opposite direction, as they came around the bend. *Id.* ¶ 33. Trooper Peirson responded, in a calm voice, "Sir, turn around and put your hands behind your back." He added, "Your wife's gonna come pick them up, OK?" *Id.* ¶ 34.

By this point, Mr. McMullin had circled back into the northbound lane and was facing Trooper Peirson, who was still in the southbound, oncoming-travel lane. The driver-side door of Mr. McMullin's vehicle was directly behind McMullin. *Id.* ¶ 35. Trooper Peirson again asked Mr. McMullin to turn around and put his hands behind his back. *Id.* ¶ 36. Mr. McMullin again refused to comply, stating, "once my kids are fine, dude, we're fine." As McMullin said this, he backed towards the door of his vehicle. *Id.* ¶ 37.

Trooper Peirson responded: "they're going to be OK. Turn around and put your hands behind your back." *Id*. ¶ 38. Mr. McMullin's passengers both exited his vehicle. *Id*. ¶ 39. One of the passengers then began calling to Mr. McMullin about his phone. Id. ¶ 40. Trooper Peirson asked Mr. McMullin, "listen to your kids, OK?" He added, "They're going to call their mother." *Id*. As Mr. McMullin yelled to his passengers about the phone, he backed closer to the driver side door of his car. *Id*. ¶ 41.

Trooper Peirson was concerned about Mr. McMullin possibly retrieving a weapon from his vehicle. *Id*. ¶ 42. Trooper Peirson was also concerned that Mr. McMullin might try to run away or flee the scene. *Id*. ¶ 43.

When Mr. McMullin's back was almost touching his vehicle, Trooper Peirson again asked him to turn around and put his hands behind his back. *Id*. ¶ 44. Mr. McMullin again refused, stating, "Not until my kids are safe. Kids have to be safe officer." As he spoke, Mr. McMullin moved to his right and away from his vehicle. He then resumed backing away from Trooper Peirson. *Id*. ¶ 45.

Trooper Peirson then warned Mr. McMullin, in a calm voice, "Don't make your kids watch this, OK?" *Id.* ¶ 46. While backing away from Trooper Peirson, Mr. McMullin responded, "Yeah, we're going to." *Id.* ¶ 47.

As Mr. McMullin again backed into the southbound lane, Trooper Peirson commanded him, in a calm voice, to turn around and put his hands behind his back. *Id*. ¶ 48. Mr. McMullin again refused to comply, stating "I will do that when I know that the kids are safe." *Id.* ¶ 49. At this point, based on Mr. McMullin's verbal responses and his physical actions, Trooper Peirson concluded that Mr. McMullin did not intend to voluntarily submit to arrest. *Id*. ¶ 50.

Trooper Peirson had been trained in, and was familiar with, the Maine State Police's policy governing the use of force by its officers. *Id*. ¶ 51. According to the policy, he knew "[a] law enforcement officer is justified in using a reasonable degree of non-deadly force upon another person . . . [w]hen and to the extent that the officer reasonably believes it necessary to effect an arrest . . . , unless the officer knows that the arrest or detention is illegal." *Id*. ¶ 52. Trooper Peirson believed he had probable cause to arrest Mr. McMullin for criminal OUI and now believed that force was necessary to effect the arrest, due to Mr. McMullin's behavior and ongoing refusal to submit to arrest. *Id*. ¶ 53.

Trooper Peirson grabbed Mr. McMullin's wrist and tried to turn him around to handcuff him. *Id*. ¶ 54. Mr. McMullin tensed his body, resisting Trooper Peirson's effort to turn him. *Id*. ¶ 55. Trooper Peirson has been trained in the use of open-handed strikes as a technique for gaining control over a person resisting arrest. According to that training, an open-hand strike is effective in diverting the resisting subject's attention elsewhere in order to gain control. *Id*. ¶ 56. Sensing that Mr. McMullin was physically resisting him, Trooper Peirson struck Mr. McMullin in the head with the open palm of his right hand. *Id*. ¶ 57. He used this tactic to draw Mr. McMullin's attention away from Trooper Peirson's effort to turn his body around and handcuff him. *Id*. ¶ 58.

When struck, Mr. McMullin grabbed Trooper Peirson around his waist, with one hand just above the officer's holstered service handgun. Although Trooper Peirson did not perceive Mr. McMullin to be attempting to gain control of his gun, he was nevertheless concerned about the proximity of Mr. McMullin's hand to his gun. *Id*. ¶¶ 59-60. To disengage Mr. McMullin's hands from his waist, Trooper Peirson leaned into Mr. McMullin, causing McMullin to fall onto

his back, and Trooper Peirson to land on top of him. *Id.* ¶ 61. They landed in the middle of the southbound, oncoming-traffic lane. *Id.* ¶ 62.

As Trooper Peirson straddled Mr. McMullin, he again attempted to handcuff McMullin, and shouted, "Turn around! Put your hands behind your back!" *Id.* ¶ 63. At the moment Trooper Peirson shouted, "Turn around!", Mr. McMullin swung his arm at Trooper Peirson. *Id.* ¶ 64. Mr. McMullin then exclaimed, "Officer!", but again failed to comply with the command. *Id.* ¶ 65. Trooper Peirson then spoke into his radio, asking for backup. *Id.* ¶ 67.

Unable to gain control of Mr. McMullin's wrists, Trooper Peirson used a second open-hand strike to distract Mr. McMullin's attention and to try to gain control—he struck Mr. McMullin in the head with his open palm. *Id.* ¶ 68. With that, Trooper Peirson was then able to roll Mr. McMullin onto his stomach. *Id.* ¶ 69. Trooper Peirson then shouted, "Give me your hands, now!" *Id.* ¶ 70. Mr. McMullin responded, "Officer, relax!" *Id.* ¶ 71. With Mr. McMullin now over on his stomach, Trooper Peirson struggled to get control of his wrists. Mr. McMullin kept moving his hands, then tucked both wrists up under his chest to keep them away from Trooper Peirson. *Id.* ¶ 72.

Still unable to grasp a wrist, Trooper Peirson delivered a third open-hand strike with his right hand to the back of Mr. McMullin's head. *Id.* ¶ 73. Trooper Peirson was then able to get control of one of Mr. McMullin's wrists and managed to attach his handcuffs to it. *Id.* ¶ 74. Mr. McMullin kept the other wrist away from Trooper Peirson, underneath his body. *Id.* ¶ 75. Trooper Peirson then commanded, "Turn around, give me the other hand." *Id.* ¶ 76. Mr. McMullin continued to resist, stating "[unintelligible] are fine, dude!" *Id.* ¶ 77. Trooper Peirson again commanded Mr. McMullin, "Give me the other hand." *Id.* ¶ 78. Mr. McMullin again failed

to comply. *Id*. ¶ 79. Around this time, Trooper Peirson scraped the back of his left hand on the pavement as he attempted to pull Mr. McMullin's wrist out from under his body. *Id*. ¶ 80.

Eight seconds after giving his last directive, Trooper Peirson again commanded Mr. McMullin "Give me the other hand!" *Id*. ¶ 81. Trooper Peirson eventually was able to get control of McMullin's other wrist by using his own strength to pull that wrist out from underneath Mr. McMullin and complete the handcuffing. *Id*. ¶ 82. Measured from the moment he first grabbed Mr. McMullin's wrist just before they both fell to the ground, it took Trooper Peirson approximately 44 seconds to handcuff Mr. McMullin. *Id*. ¶ 83.

Trooper Peirson delivered a total of three or four open-handed strikes to Mr. McMullin as he attempted to gain control of his wrists to handcuff him. *Id*. ¶¶ 85-86. Each time Trooper Peirson struck Mr. McMullin it was because he was resisting arrest. *Id*. ¶ 84. Once Mr. McMullin was in custody, Trooper Peirson requested an ambulance for Mr. McMullin and waited with him until he was placed in the ambulance. *Id*. ¶¶ 93-94. Based on a blood draw in the hospital, Mr. McMullin was determined to have a blood-alcohol content of 0.149%. Joint Stipulations of Fact ("JSF") ¶ 3, (ECF Doc. 21).

### Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Cortes-Rivera v. Dep't of Corr. & Rehab. of Com. of P.R.*, 626 F.3d 21, 26 (1st Cir. 2010). "The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006). But, a nonmovant "cannot rely on speculation to avoid summary judgment." *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 136 (1st Cir. 2013); *see also Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir.

2010) ("Conclusions that rest wholly on speculation are insufficient to defeat a motion for summary judgment.").

## Argument

### I.    Trooper Peirson Is Entitled to Qualified Immunity on Plaintiff's § 1983 Claim

In the single count of the Complaint, the plaintiff asserts a claim under 42 U.S.C. § 1983 against Trooper Peirson alleging that he used excessive force against Mr. McMullin in violation of the Fourth Amendment.[1] Compl. ¶ 28. (ECF Doc. 3-2). Qualified immunity is a defense against § 1983 claims. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The test for determining qualified immunity at the summary judgment stage has two parts. First, the court considers whether "the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation." *Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014). Second, the court considers "whether the violated right was clearly established at the time that the offending conduct occurred." *Id.*

Here, Trooper Peirson did not violate the Fourth Amendment at all, let alone any clearly established law applying the Fourth Amendment. He is entitled to qualified immunity under

---

[1]    Section 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983.

either prong of the two-part framework.[2]

## A.  Trooper Peirson's Use of Force Was Objectively Reasonable

To prove that Trooper Peirson violated the Fourth Amendment's proscription of unreasonable seizures, the plaintiff must show that the "level of force was objectively unreasonable under the circumstances." *Fernandez-Salicrup v. Figueroa-Sancha,* 790 F.3d 312, 326 (1st Cir. 2015); *see also Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) ("claims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard"); *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007). There is no "mechanical application" in determining whether a law enforcement officer used excessive force in violation of the Fourth Amendment; rather "careful attention must be paid to the facts and circumstances of each particular case. *Fernandez-Salicrup,* 790 F.3d at 326 (quoting *Graham,* 390 U.S. at 396). In this analysis, three such factors merit special attention: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he [or she] is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

The reasonableness standard is "comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." *Berube v. Conley*, 506 F.3d 79, 83 (1st Cir. 2007) (quoting *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994)). The calculus must allow for the fact that "police officers are often

---

[2]     "Federal courts have discretion to bypass the first step of the qualified immunity framework and to focus instead on the second step." *Ford*, 768 F.3d at 23; *see also Pearson*, 555 U.S. at 236. Skipping to the second step is worthwhile "where the constitutional questions presented are heavily fact-bound, minimizing their precedential value." *Maldonado v. Fontanes*, 568 F.3d 263, 270 (1st Cir. 2009); *see also Pearson*, 555 U.S. at 237 ("For one thing, there are cases in which the constitutional question is so factbound that the decision provides little guidance for future cases."). Because Trooper Peirson is entitled to summary judgment on either step of the analysis, he takes no position on whether the Court should bypass the first step.

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Roy*, 42 F.3d at 695). Plaintiff thus may not rely on the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Nor can plaintiff survive summary judgment by showing merely that the police could have better handled the situation. *Roy*, 42 F.3d at 695 ("In close cases, a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently.").

      1. *Trooper Peirson's Use of Force Was Reasonable Under* Graham v. Connor

The Supreme Court has long recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Thus, once Mr. McMullin made clear he would not voluntarily submit to arrest, Trooper Peirson was entitled to use force to place him under arrest. The only question is whether the degree of force was reasonable under the totality of the circumstances. Here, the *Graham* factors—particularly the second and third factor—indicate that the moderate level of force used by Trooper Peirson to effect the arrest was reasonable.

*Severity of the Crime.* The First Circuit has characterized operating under the influence as a "serious offense," although not one that inherently poses a risk of danger to the arresting officer. *Parker v. Gerrish*, 546 F.3d 1, 9 (2008); *see Cookson v. City of Lewiston*, No. 11-cv-460, 2013 WL 945502 (D. Me. Feb. 7, 2013).

*Immediate Threat to Safety of the Officers.* From the perspective of a reasonable officer on the scene—without the benefit of the "20/20 vision of hindsight," *Graham*, 490 U.S. at 396–97—Mr. McMullin posed an immediate threat to officer safety throughout the encounter. Mr. McMullin was intoxicated, JSF ¶ 3; DSMF ¶ 17, and thus had impaired judgment and increased

unpredictability. Mr. McMullin had not only repeatedly refused to comply with Trooper Peirson's commands to submit to arrest, but had responded with an ultimatum: that he, McMullin, would not submit to arrest until Trooper Peirson called his wife to come to the scene. *Id.* ¶ 45. Given Mr. McMullin's behavior, it was reasonable for Trooper Peirson to assume that McMullin would respond to physical compulsion—which by that point appeared necessary to effect the arrest—by fighting back. Intensifying the risk, Trooper Peirson was alone. *Id.* ¶ 3. He had no backup if Mr. McMullin were to gain the upper hand in a physical altercation. Trooper Peirson was also outnumbered. *Id.* ¶ 13. Though Mr. McMullin's two passengers took no threatening actions toward Trooper Peirson, they did exit the car and remain at the scene, while Trooper Peirson's attention was occupied by his altercation with Mr. McMullin. *Id.* ¶ 39. A reasonable officer could have been concerned that the passengers might attempt to somehow intervene in the struggle to aid Mr. McMullin. And, finally, Trooper Peirson was reasonably concerned about the possibility that Mr. McMullin might have a weapon in his vehicle, *id.* at ¶ 42, which he could conceivably seek to retrieve once the situation devolved to a physical alteration.

It was thus reasonable for Trooper Peirson to respond with a moderate level of force—an open-handed strike to the head—once he felt Mr. McMullin physically resist his attempt to grab his wrist to handcuff him. Based on his training, Trooper Peirson had a reasonable basis to believe that such a strike would distract Mr. McMullin's attention, allowing him to complete the handcuffing process. *Id.* ¶ 56. Trooper Peirson could have reasonably concluded, in light of the risks discussed above, that he needed to take decisive action to overcome Mr. McMullin's resistance and get him in handcuffs before McMullin (or, conceivably, his passengers) could fight back. That the strike did not achieve the desired result does not make it unreasonable.

Trooper Peirson's actions after the initial strike were also reasonable in light of the threat. In response to the strike, Mr. McMullin grabbed Trooper Peirson's waist, near his gun. *Id.* ¶ 59. Given the obvious safety concern with a suspect reaching near an officer's firearm, it was reasonable for Trooper Peirson to take action to disengage Mr. McMullin's hands by leaning into him and causing them both to fall to the ground. Moreover, once they were both on the ground, and Mr. McMullin was still actively resisting being handcuffed, *id.* ¶¶ 64, 72, Trooper Peirson was justified in applying the two-to-three additional strikes in order to gain control of McMullin as quickly as possible. As the scuffle continued, Trooper Peirson could reasonably have been concerned that Mr. McMullin might punch, kick, or otherwise attempt to harm him in an attempt to avoid arrest. Indeed, though Trooper Peirson did not see it at the time, the video shows that Mr. McMullin in fact swung at Trooper Peirson with his arm during the struggle. *Id.* ¶ 64. In addition, Mr. McMullin and Trooper Peirson were lying in the middle of the oncoming traffic lane of a road, in relative darkness, just after the bend in the road. *Id.* ¶¶ 7, 9, 62. The need to get himself and Mr. McMullin out of the oncoming traffic lane before any cars approached—and potentially ran over them—further justified the use of more decisive force to gain control of Mr. McMullin.

Notably, this is not a case in which the officer continued to use force after the suspect was subdued, and thus no longer posed a threat. Here there is no dispute that Trooper Peirson ceased applying force once Mr. McMullin was secured in handcuffs. *Id.* ¶ 86.

*Resisting Arrest or Attempting to Evade Arrest by Flight.* The final *Graham* factor—whether the suspect was resisting arrest or attempting to evade arrest by flight—cuts clearly and decisively in favor of Trooper Peirson. Mr. McMullin refused multiple opportunities, within a short period of time, to peacefully submit to arrest. *Id*. ¶¶ 18, 26, 29, 34, 36, 38, 44, 46, 48.

13

Throughout the incident Mr. McMullin retreated from Trooper Peirson, making it impossible for Peirson to handcuff him. Trooper Peirson eventually became concerned that McMullin might try to leave the scene altogether. *Id*. ¶ 43.

It soon became apparent that Mr. McMullin intended to not just evade, but to actively resist arrest. When Trooper Peirson asked Mr. McMullin not to "make his kids watch this," Mr. McMullin responded "Yeah, we're going to…," *id.* ¶ 47, telegraphing his intent to resist if Trooper Peirson attempted to handcuff him by force. When Trooper Peirson grabbed Mr. McMullin's wrist to attempt to turn him around to handcuff him, Mr. McMullin resisted this by tensing his body. *Id*. ¶ 55. Under these circumstances—in which Mr. McMullin had both expressed an intent to resist and was doing so—it was reasonable for Trooper Peirson to follow his training and apply an open-handed strike to the face in order to distract Mr. McMullin and obtain control of his hands. *Id*. ¶¶ 56, 57, 58.

Once Mr. McMullin and Trooper Peirson fell to the ground, it is undisputed that Mr. McMullin's resistance continued. McMullin continued to withhold his hands from the officer. *Id*. ¶¶ 61, 65. After Trooper Peirson delivered a second strike, he was able to roll Mr. McMullin onto his stomach but remained unable to gain control of his hands. *Id*. ¶¶ 68-69. Mr. McMullin actively resisted Peirson's efforts by moving his wrists underneath his chest so Trooper Peirson could not reach them. *Id*. ¶¶ 72. It was this withholding of his hands that prompted Trooper Peirson's third open-hand strike. *Id*. ¶ 73. Trooper Peirson was then able to get control of one of Mr. McMullin's wrists and managed to attach his handcuffs to it. *Id*. ¶ 74. Even then Mr. McMullin kept the other wrist away from Trooper Peirson, underneath his body. *Id*. ¶ 75. Trooper Peirson had to use his own strength to pull that wrist out from underneath Mr. McMullin in order to complete the handcuffing. *Id*. ¶ 81.

14

Each time Trooper Peirson struck Mr. McMullin it was because he was resisting arrest. *Id.* ¶ 84. Trooper Peirson used the open-handed strikes strategically to try to get control of a bellicose, uncooperative intoxicated man. As soon as Trooper Peirson secured Mr. McMullin in handcuffs, he ceased using force. The third *Graham* factor thus strongly favors the defendant.

2. *Caselaw Confirms that Trooper Peirson's Use of Force Was Reasonable*

Caselaw confirms that Trooper Peirson's actions were reasonable under the *Graham* analysis.

In *Statchen* v. *Palmer*, 623 F.3d 15 (1st Cir. 2010), two police officers tried to arrest a man for public intoxication and take him into custody. *Id.* at 16-17. The suspect, Statchen, refused orders to put his hands out to be handcuffed. *Id.* at 17. The officers grabbed him around his arms, whereupon the men tumbled to the ground and a struggle ensued. *Id.* The officers were "kneeing and hitting" the resisting suspect, until he finally stopped struggling, and submitted. *Id.* He resisted being handcuffed again when he was about to be transferred to a jail located away from the station. *Id.* Several officers rushed him, fought with him and subdued him. *Id.* He was later found to have two fractured ribs. *Id.*

The First Circuit affirmed the lower court's grant of summary judgment to the officers. Though the Court characterized the degree of force used by the officers as "considerable," it found such force to be justified based on the fact that Statchen "refus[ed] to submit" and then, when the officers grabbed his arms, "fell to the ground and continued to grab and struggle with the officers." *Id.* at 18. The Court further noted that, notwithstanding a factual dispute as to whether Statchen tried to bite an officer, it was "perfectly clear that [Statchen] did not obey their initial verbal commands and did not lie still once he had landed on the ground." *Id.* at 18 n.2. The Court also noted that the officers "ceased to use force" when Statchen agreed to stop resisting.

*Id.* at 18-19. Based on these undisputed facts, the Court found "no evidence to indicate the force exerted (however considerable) was unnecessary, or that a reasonable police officer would have thought otherwise." *Id.*

The facts in *Statchen* are not meaningfully distinguishable from the facts here. Like Statchen, Mr. McMullin was intoxicated and refused commands to submit to arrest. As in *Statchen*, Trooper Peirson's attempt to grab Mr. McMullin's arm for handcuffing resulted in the parties falling to the ground in a struggle. Mr. McMullin, like Statchen, did not "lie still once he had landed on the ground," *id.* at 18 n.2, but actively resisted Trooper Peirson's attempts to handcuff him. The officers in *Statchen* applied a level of force indistinguishable from Trooper Peirson's strikes, "hitting" and "kneeing" Statchen as he resisted on the ground. *Id.* at 17. Statchen, like Mr. McMullin, sustained a notable injury as a result of the scuffle. And, as in *Statchen*, Trooper Peirson ceased using force as soon as Mr. McMullin was secured in handcuffs. *Statchen* thus confirms the reasonableness of Trooper Peirson's use of moderate force to arrest the intoxicated and uncooperative Mr. McMullin.

In *Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012), the Fifth Circuit held that a motorist failed to show that officers' use of force in arresting him following a traffic stop was objectively excessive or clearly unreasonable. The suspect, Poole, had been driving recklessly and smelled of alcohol. *Id.* at 625. He refused to turn around and be handcuffed and actively resisted the officers' instruction. *Id.* at 626, 629. One officer forced Poole's left arm behind his back and held it there, while the other officer tasered Poole repeatedly, trying to get him to give up his second arm. *Id.* at 626. Poole verbally and physically refused to give the officers his left arm, and kicked them as he struggled to resist. *Id.* As a result of the struggle, Poole's left arm was dislocated, causing permanent damage to his hand and shoulder. *Id.*

If the officers' use of force in *Poole* was reasonable, then surely Trooper Peirson's use of force was reasonable as well. Once Poole started backing away, the officers responded by grabbing his arm, twisting it behind his back in a painful manner, and then repeatedly shocking him with a taser. Trooper Peirson, in contrast, gave Mr. McMullin many chances to submit to arrest before using force. Trooper Peirson resorted to an open-handed strike only after McMullin resisted lesser force. Trooper Peirson never resorted to a taser or other non-lethal device. Further, Trooper Peirson showed such restraint even though, unlike the two officers in *Poole*, he was alone with no backup.

In *Schliewe v. Toro*, 138 Fed. App'x 715 (6th Cir. 2005), the plaintiff had been arrested for a minor crime and, while detained at the police station, attempted to run through an open door. Several officers converged upon him and one officer punched him in the face, breaking his jaw. *Id.* at 718. Another officer kicked the plaintiff in the back as he was wrestled to the ground. *Id.* In finding the punching officer's actions reasonable, the Court observed, "[w]hile punching someone may not be the best way to prevent his escape, it cannot be said that the blow was objectively unreasonable." *Id.* at 722.

While Mr. McMullin was not attempting escape, he certainly, like the plaintiff in *Schliewe*, "resisted the officer['s] attempts to subdue him." *Id.* at 722. He previously made clear his intention to resist. Given the similar need for force to subdue the arrestee, the mere fact that McMullin was not actively attempting to flee the scene does not meaningfully distinguish the circumstances of *Schliewe* from the circumstances here. *Schliewe* thus supports the reasonableness of Trooper Peirson's actions.

Finally, *Murphy v. Palmer*, No. 14-cv-6896, 2017 WL 2364195 (D.N.J. May 31, 2017), involved the arrest of a man who was noncompliant and verbally belligerent as police attempted

to arrest him. Specifically, after being told he was under arrest, the man screamed obscenities at police and attempted to retreat inside a house. *Id.* *4. Police tackled the man and attempted to handcuff him on the ground. *Id.* *5. Like McMullin, the man's hands were underneath him, making him difficult to handcuff, although there was a dispute of fact as to whether the man was purposefully withholding his hands or was unable to extricate them. *Id.*

The Court found the officers' actions to be objectively reasonable under the circumstances. The Court found it reasonable for the officers to believe that the man posed a threat based on his belligerence towards the officers. *Id.* *13. It noted that the man "acted uncooperatively throughout his interaction" with the officer. *Id.* The Court also found it significant that the use of force was limited to the period where the officers were "effectuating the arrest." *Id.* Finally, noting the principle that police are allowed to use "some force" when effectuating an arrest, the court found immaterial the man's factual claim that he was not resisting but was rather just physically unable to offer his hands for handcuffing because they were pinned underneath him. *Id.*

Taken together, the above cases show that it is not objectively unreasonable to use the moderate force of a blow to the head in order to subdue an intoxicated, uncooperative, and resisting suspect subject to a lawful arrest.

**B.  Clearly Established Law Did Not Prohibit Trooper Peirson's Use of Force**

Even assuming arguendo that Trooper Peirson used an objectively unreasonable amount of force, he would still be entitled to qualified immunity because there was no clearly established law as of February 21, 2016, putting him on notice that his conduct was unconstitutional.

Even if an officer uses an unreasonable amount of force, qualified immunity will protect the officer so long as his mistake was reasonable. *Saucier v. Katz*, 533 U.S. 194, 206 (2001). To defeat qualified immunity, plaintiff must show that the officer violated a right that was "clearly

18

established" at the time of the violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). This is an "exacting standard" and a "heavy burden indeed" for the plaintiff. *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015) (quoting *City and County of San Francisco v. Sheeha*n, 135 S. Ct. 1765, 1774 (2015)). To be clearly established, the contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). That precedent, moreover, must be in the form of either "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *al-Kidd*, 563 U.S. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *see also Walden v. City of Providence, R.I.* 596 F.3d 38, 53 (1st Cir. 2010).

The Supreme Court has repeatedly admonished lower courts that clearly established law "should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *al-Kidd*, 563 U.S. at 742.) It is thus insufficient to rely upon "*Graham, Garner*, and their Court of Appeals progeny, which . . . lay out excessive-force principles at only a general level." *Id.* at 552. Rather, Plaintiff must "identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment." *Id.* Here, then, to defeat qualified immunity, Plaintiff must point to a decision of controlling authority or a robust consensus of non-controlling caselaw that would have placed Trooper Peirson on notice that the Fourth Amendment prohibits use of open-handed strikes to the head in order to handcuff a verbally and physically resisting person subject to lawful arrest for a serious crime.

We are not aware of any factually similar cases in the First Circuit or a robust consensus of non-controlling caselaw clearly establishing that Trooper Peirson's use of force was unconstitutional. The most factually similar controlling decision appears to be *Statchen*, which, as already discussed (see Part I.A.2, above), strongly indicates Trooper Peirson's use of force was reasonable, despite Mr. McMullin's injury. Moreover, even if Plaintiff is able to find factually similar out-of-circuit cases in which the officer's use of force was found to be unreasonable, the cases cited in Part I.A.2 preclude any contention that there is a "robust consensus" that conduct like Trooper Peirson's is unreasonable.

With no on-point First Circuit or Supreme Court caselaw supporting his position and no favorable consensus of non-controlling caselaw, Mr. McMullin cannot meet his burden of demonstrating that he had a clearly established right to resist arrest without being subjected to the force applied by Trooper Peirson to secure his arrest.

## Conclusion

For the reasons stated above, Defendant respectfully requests that the Court enter summary judgment in his favor as to all of plaintiff's claims.

DATED: May 17, 2018                          JANET T. MILLS
                                             Attorney General


                                             /s/ Cathy S. Roberts
                                             _____
                                             CATHY S. ROBERTS
                                             JONATHAN R. BOLTON
                                             Assistant Attorneys General
                                             6 State House Station
                                             Augusta, Maine  04333-0006
                                             Tel. (207) 626-8800
                                             Fax (207) 626-8518
                                             cathy.roberts@maine.gov
                                             jonathan.bolton@maine.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this, the 17th day of May, 2018 I electronically filed the

documents listed below with the Clerk of Court using the CM/ECF system, which will send a

copy of such to counsel of record for the parties.


/s/ Cathy S. Roberts
_____
CATHY S. ROBERTS
JONATHAN R. BOLTON
Assistant Attorneys General
6 State House Station
Augusta, Maine  04333-0006
Tel. (207) 626-8800
Fax (207) 626-8518
cathy.roberts@maine.gov
jonathan.bolton@maine.gov